**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| NEW EXCAVATING TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  3:25 C 50422 |
| | ) | |
| LOVE'S TRAVEL STOPS & COUNTRY STORES, INC., | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff New Excavating Technology ("NET") is in the business of constructing wastewater treatment plants ("WWTPs").  In 2019, Defendant Love's Travel Stops ("Love's"), a familiar chain of roadside truck stops, began negotiating with NET to construct a WWTP at a new Love's station in Monroe Center, Illinois.  In 2021, NET sent Love's a document—referred to here as the "Proposal"—offering to construct the facility for roughly $1.3 million.  In circumstances that are hotly disputed by the parties, a Love's official signed the Proposal, but later killed the deal and hired another contractor.  In response, NET filed this lawsuit, invoking the court's diversity jurisdiction[1] and asserting a breach of contract claim under Illinois law.  Both parties have filed cross-motions for summary judgment on the issue of whether the Proposal constitutes a binding contract.  As explained below, the court finds that triable issues of fact preclude summary judgment on the issue.  Both motions are denied.

---

[1]    Plaintiff is incorporated in Illinois and has its principal place of business here.  Defendant is incorporated in, and has its principal place of business in, Oklahoma.  (Compl. [5] ¶¶ 4, 5.)  Because the amount in controversy exceeds $75,000, jurisdiction is proper pursuant to 28 U.S.C. § 1332(a).

**BACKGROUND**

The primary issue in dispute is whether the Proposal is enforceable as a contract. The factual background is detailed below.[2]

Love's is a privately owned company that operates hundreds of travel stops across the continental United States. (DSOF [42] ¶¶ 1, 3.) These stores sell gasoline, food, groceries, and other necessities to travelers, and many locations also offer laundry and shower facilities. (*Id.* ¶ 2.) At some point (exactly when is unclear) Love's sought to construct a new store in Monroe Center, Illinois, a small community located south of Rockford. The Monroe Center facility required a wastewater treatment plant (WWTP) which, as the name suggests, is "a system designed to clean wastewater before being discharged." (DSOF [42] ¶ 7.) Beginning around 2019, Sam Polena—a third party contractor hired by Love's to be the design engineer for the project— contacted Plaintiff NET and asked it to "do work concerning design, permitting, and soil evaluations" for the WWTP. (*Id.* ¶ 4, 10–13; PSOF [60] ¶ 4.)

NET is a "family-run excavation company" that "designs and installs wastewater treatment systems." (PSOF [60] ¶ 1.) Ray Tebo owns the company. (*Id.* (undisputed in relevant part).) NET contends that because the construction of a WWTP is a process that requires "planning, permitting, and preparation before construction commences," it is "common in this industry for work to commence prior to the signing of a formal, written contract." (*Id.* ¶ 5.) NET further asserts that, between roughly 2019 and 2021, it performed extensive work on the WWTP project including (1) traveling to the site, (2) conducting soil evaluations, (3) purchasing equipment, (4) interfacing with the Illinois Department of Health, (5) contracting with Ed Gelsone, a third-party engineer, to

---

[2]  The facts set forth here are presented in the parties' statements of fact pursuant to this court's Local Rule 56.1. Defendants' Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [42] ¶ ___." Plaintiff's Response to Defendant's Local Rule 56.1 Statement is cited here as "Pl.'s Resp. [60] ¶ ___." Plaintiff has also submitted an Additional Statement of Facts, cited here as "PSOF [60]¶ ___." Defendants' Response to Plaintiff's Additional Statement of Facts is cited here as "Def.'s Resp. [70] ¶ ___." Plaintiff's Additional Statement of Facts and Responsive Statement of Facts are cited in the same document, located at Docket No. 60.

perform work on the project, (5) negotiating with vendors, (6) providing input into the proposed design, and (7) meeting with Love's employees and contractors. (*Id.* ¶¶ 5, 7–10, 13–15, 27.) Plaintiff notes that during this time, Kim Cooper, one of Love's contractors, wrote an email to Love's employees and Colcon Corporation (the general contractor) identifying NET as the "people handling the WWTP for Love's." (*Id.* ¶ 12.)

Love's acknowledges that Tebo performed work on the project during this time (*e.g.*, Def.'s Resp. [70] ¶¶ 8, 14, 15), but disputes several of NET's assertions. Love's contends there is no industry practice of beginning work prior to finalizing a written agreement. Love's asserts, further, that it never approved the work Tebo described (*id.* ¶ 7), and argues that NET has only offered evidence of a single undated meeting with Love's agents (*id.* ¶ 13).

By the summer of 2021, NET sought to "formalize" its relationship with Love's. (PSOF [60] ¶ 16.) On July 28, 2021, Mr. Tebo emailed a number of Love's employees to ask who he was "supposed to work with to execute the contract for the Monroe Center WWTP," noting that a general contractor was "starting site work this week." (Def.'s Ex. K. [40-10] at 2.) Chris Weldon, Love's Environmental Manager, forwarded the email to Lisa Hogue, Love's Construction Project Assistant, and asked Ms. Hogue to "help [Tebo] get the contract stuff finalized." (*Id.*; PSOF [60] ¶ 16.) Ms. Hogue then asked Tebo by email for "the quote" because she "will need it for the contract and PO." (Def.'s Ex. K [40-10] at 3.)

Tebo responded on July 30, 2021, emailing a copy of the document at issue in this case. This document, entitled "Proposal," includes three sections. The first section is not titled, but it lists specifications for the proposed WWTP facility. (Proposal [5-1].) The second section, also untitled, states that NET "hereby propose[s] to furnish labor and materials . . . in accordance with the above specifications" for $1,380,000, with half due up front and half "upon completion." (*Id.*) This section includes a signature line on which "Ray Tebo C/O New Excavating Technology, Inc" appears in romanized typeface. The third section of the document is entitled "Acceptance of Proposal." It states: "The above prices, specifications and conditions are hereby accepted. You

3

are authorized to do the work as specified. Payment will be made as outlined above." (*Id.*) Two signature lines appear immediately below this sentence, but neither are labeled. This opinion will refer to this document as the "Proposal," and the three sections respectively as the "Specifications Section," the "Offer Section," and the "Acceptance Section," but cautions that these monikers are for the benefit of the reader and should not be read as a substantive holding as to the document's legal validity.

On Wednesday, August 4, 2021, at 11:37 a.m., Ms. Hogue sent the Proposal to Roger Patterson, the Construction Manager for the Monroe Center project, for signature. (Ex. M [40-12].) Hogue sent the document via DocuSign, a digital service that Love's uses to affix digital signatures to contracts and other documents. (*Id.*) The DocuSign message includes the words "Hello Roger, Please review, sign and return to me. Thank you, Lisa." (*Id.*) At 11:40 a.m. that morning, Mr. Patterson signed the first signature line of the "Acceptance of Proposal" section via DocuSign, and evidently returned a digital version of it to Ms. Hogue. (*Id.*)

It is not clear, however, when the signed Proposal was forwarded to NET. In an affidavit, Mr. Tebo states that he cannot recall when he was sent a signed copy of the document, but notes that Ms. Hogue told him at some point, via telephone, that Mr. Patterson had signed the agreement.[3] (Tebo Aff. [61-2] ¶¶ 4–5.) Mr. Tebo has not identified the date or time of this phone call, but he explained that he and Hogue spoke by phone many times between July and September 2021. (Tebo. Dep. [60-2] at 146:10–24.) For her part, Hogue testified that she could not recollect any phone conversations with Tebo, and that she generally preferred to communicate by email so that she has a "paper trail." (Hogue Dep [40-1] at 272:3–16.) As far as the court can tell, there is no evidence that this call did (or did not) take place apart from the

---

[3]     Because Hogue was an employee of Love's at the time this call took place (PSOF [60] ¶ 16), the court will assume that Tebo's testimony about what Hogue said in the phone call is admissible. *See* FED. R. EVID. 801(d)(2)(D).

testimony of Mr. Tebo and Ms. Hogue. Neither party has offered phone records, contemporaneous notes, or any other evidence on the issue.

A few days after Patterson signed the Proposal, things went south. On Monday, August 9, 2021, Hogue emailed Tebo with a copy of Love's "Standard Agreement."[4] (PSOF [60] ¶29.) While the terms of the Agreement and the terms of the Proposal have some overlap, they differ in certain important respects. For example, Love's Standard Agreement (1) included liquidated damages and indemnity provisions, and (2) called for full payment to be paid at completion of the project, with no upfront payment. (*Id.* ¶¶ 30–31.) The signed Proposal document from NET was attached as an exhibit to Love's Standard Agreement form, with a single signature in the Acceptance Section—that of Mr. Patterson.

Both parties agree that the Proposal was submitted as an exhibit to the Standard Agreement, but Love's also asserts that it is *only as an exhibit* to Love's own Standard Agreement form that Love's ever returned a signed version of the Proposal to Mr. Tebo. (DSOF [42] ¶ 36.) NET appears to dispute this, but has offered no evidence to rebut it. Mr. Tebo himself does not recall when he received the signed Proposal from Love's, and does not claim to have received a copy of it prior to August 9, 2021.[5] (Pl.'s Resp. [60] ¶ 36.) For purposes of summary judgment, the court assumes that Tebo received a signed copy of the Proposal for the first time in the August 9 email. (Tebo Aff. [61-2] ¶ 5.)

Notably, the copy of the signed Proposal emailed to Mr. Tebo on August 9 does not include Tebo's own signature in the Acceptance Section—his name appears only in the Offer Section— but the copy that NET submitted as an exhibit to its Complaint [5] does bear Tebo's signature,

---

[4] Love's explains that, as a standard practice, it requires contractors to submit a quote or proposal that functions as a "bid by the contractor to work on the construction project." (DSOF [42] ¶¶ 18–20.) If the bid contains "satisfactory price estimates," Love's then prepares its "Standard Agreement" with final terms. (*Id.* ¶¶ 20–23.)

[5] As noted above, Tebo does claim that he was informed by Hogue via phone that the contract was accepted by Patterson. (Tebo Aff. [61-2] ¶ 5.)

together with Patterson's, on the second line in the Acceptance Section. (*Compare* Pl.'s Mot., Ex. L [40-11] at 6 (not signed by Tebo), *with* Compl., Ex. 1 [5-1] (signed by Tebo).) Because Tebo does not recall when he received (or signed) the document (Tebo Dep. [60-2] at 177:5–178:15), the court concludes that he received a copy signed by Mr. Patterson only as an exhibit to Love's Standard Agreement, and that Tebo signed the Acceptance Section at some point between receiving the Proposal on August 9, 2021, and the filing of this lawsuit on September 12, 2024. (*See* Mot. [42] at 23 n.2.)

NET thus had a signed version of the Proposal in hand as of August 9, 2021. But the parties continued to negotiate the terms of their arrangement over the next several months, and the Standard Agreement was never signed. Eventually, Love's agreed to increase the price of the contract to $1,540,000, and also agreed to pay for 50% of materials up front, but NET was nevertheless hesitant—as the court understands things, NET preferred to receive 50% of the full contract price upfront due to required investments on equipment and labor. (PSOF [60] ¶ 33.) On September 16, 2021, in an email that NET describes as "out of the blue," Hogue informed Tebo that Love's was "killing the deal" and planned to select another contractor. (*Id.* ¶ 35.) In her deposition, Ms. Hogue explained that Love's backed out because they felt "it was just going back and forth and nothing was getting settled . . . and we needed to move forward." (Hogue Dep. [60-5] at 284:25–285:8.)

While both parties agree that these negotiations took place mostly as described, they disagree as to their ultimate purpose. Love's argues that the July 30 Proposal was a non-binding quote. In support, Love's points to the fact that the Proposal was sent in response to an email requesting a "quote," and was returned by email only as an exhibit to another proposed written contract. Love's also contends that NET did not take the position that the July 30 Proposal was a binding contract until "years later," and that Mr. Tebo's willingness to engage in negotiations demonstrates that he did not, at that time, view the Proposal as binding. (DSOF [42] ¶¶ 45–52 (detailing emails between NET and Love's); *see also id.* ¶ 54 (explaining that NET did not inform

Love's that it viewed the contract as binding).) For example, Love's quotes statements Tebo made in an August 19, 2021 email to Kim Cooper, an employee of one of the contractors Love's hired for the project, that suggest he did not view the Proposal as a binding contract:

> I emailed Chris Weldon July 28th. He told me he thought the GC was responsible for the WTTP. He asked Lisa Hogue to help clarify. **We were asked to provide a proposal so she could draft a contract. We received a contract which my law firm and company has been reviewing** . . . We are working on the contract but time-frames according to the gentleman onsite are very limited. We sourced and built some things last year but obviously last year was hard for everyone's schedules communications or lack there of [sic]. Other material prices and availability are extreme to say the least. We're just trying to get everything clarified and underway as soon as possible.

(Def.'s Mot., Ex. I [40-8] at 3–4 (emphasis added).)

NET disagrees. It argues that the Proposal was indeed a binding contract, and characterizes the subsequent discussions as efforts to negotiate "additional terms" (i.e., a modification) to the original deal. (PSOF [60] ¶¶ 30, 32.) NET does not dispute that Tebo waited years to assert that the Proposal was binding, however, and does not explain the reason for the delay. (Pl.'s Resp. [60] ¶ 54.) In the end, NET estimates it devoted approximately 250 hours to work on the site during the summer of 2021, including installing a fence, negotiating with vendors, developing schematics, and working on regulatory approval. NET was never paid for any of this work.[6] (PSOF [60] ¶¶ 27–28.)

This lawsuit resulted. On September 12, 2024, NET filed a Complaint [5] in the Central District of Illinois, bringing claims of (1) breach of express contract, (2) breach of implied contract, (3) unjust enrichment, and (4) promissory estoppel. (Compl. [5] at 3–5.) Love's then moved for summary judgment [42], primarily on the basis that the July 30 Proposal was not a binding contract. Because the summary judgment briefing makes it clear that the events of this case occurred in Ogle County, Illinois—a county which is part of the Northern District of Illinois, *see* 28

---

[6] Love's acknowledges that NET completed work on the site (Def.'s Resp. [70] ¶ 27), but questions the accuracy of the 250 hour estimate, and accuses Plaintiff of "mischaracteriz[ing] the timing of [its] work." (*Id.* ¶¶ 27–28).

U.S.C. § 93(a)(2)—Judge Bruce of the Central District ordered the case transferred to this court. (Order [48].)  Shortly after, NET filed its own motion for summary judgment [60], asking this court to find, as a matter of law, that the Proposal was a valid and enforceable contract.  Both motions are now fully briefed and ripe for consideration.

## LEGAL STANDARD

Summary judgment is appropriate if "'there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.'" *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026) (quoting FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  In considering a motion for summary judgment, the court construes "the facts in the light most favorable" to the non-moving party.  *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings.  *Anderson*, 477 U.S. at 256–57 (1986).  Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion."  *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## DISCUSSION

### I.    Breach of Express Contract

The gravamen of NET's lawsuit is a breach of express contract claim under Illinois law.  In cross motions for summary judgment, both parties assert they are entitled to summary judgment on the issue of the contract's validity.  The court examines these claims below.

## A.      Acceptance

The core dispute in this case is whether Love's accepted or assented to the Proposal. Love's argues that it did "not intend to enter into a binding agreement," and points to evidence that it believes objectively shows that neither party intended for the Proposal to be binding. (Def.'s Mot. [42] at 19.) Conversely, NET argues that the language in the document, combined with the signature of a Love's representative, unambiguously expresses an intent to be bound. As explained below, factual disputes between the parties preclude summary judgment for either side on this issue.

The pertinent principles of contract law are familiar:  Under Illinois law, the ingredients of "an enforceable contract" are "offer, acceptance, consideration, and mutual assent." *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011); *see also Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883 (7th Cir. 2022). "It is a basic tenet of contract law that 'in order for there to be a contract between parties, there must be a meeting of the minds or mutual assent as to the terms of the contract.' " *Campos v. Tubi, Inc.*, 716 F. Supp. 3d 623, 630 (N.D. Ill. 2024) (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 314, 113 Ill. Dec. 252, 256, 515 N.E.2d 61, 65 (Ill. 1987)). "Illinois courts use an objective approach to determine whether parties have mutually agreed to the formation of an agreement." *Rose v. Mercedes-Benz USA, LLC*, 167 F.4th 975, 978 (7th Cir. 2026). Under this theory, "intent to manifest assent" is demonstrated by objective "expressions such as words and acts"—not the parties' subjective intent to enter into a deal. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016); *see also* 2 WILLISTON ON CONTRACTS § 6:3 (4th ed. 2025) ("[A]n actual intention to accept is unimportant except in those situations when the acts or words of the offeree are ambiguous."). This means that parties' "undisclosed intentions are not relevant" to whether a contract has been formed, especially when those intentions are at odds with "the language they used in the contract." *Carey v. Richards Bldg. Supply Co.*, 367 Ill. App. 3d 724, 727, 305 Ill.Dec. 492, 495, 856 N.E.2d 24, 27 (2nd Dist. 2006). "The existence of a contract, its terms, and the

9

parties' intent are questions of fact to be determined by a trier of fact." *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526 ¶ 19, 194 N.E.3d 534, 542 457 Ill. Dec. 45, 53 (1st Dist. 2021).

With these principles in mind, the court turns first to the language of the Proposal. While the document is ostensibly labeled "Proposal,"[7] it lays out, with particularity, the specifications of the planned WWTP and offers to construct it for around $1.3 million. Most importantly, the document includes a section entitled "Acceptance of Proposal" that is signed by Mr. Patterson, a Love's representative. The language of this section is unambiguous; it states that the "above prices, specifications and conditions are *hereby accepted*. You are authorized to do the work as specified. Payment *will* be made as outlined above." (Proposal [5-1] (emphasis added).) This clause includes no "[w]ords expressing contingency or dependence on a subsequent event or agreed-on element," *PFT Roberson, Inc. v. Volvo Trucks N.A., Inc.*, 420 F.3d 728, 732 (7th Cir. 2005), strongly suggesting that the parties viewed this document as a done deal. While Love's offers a variety of arguments that suggest that Mr. Patterson did not intend to definitively accept the terms of the deal when he signed it, this inquiry is an objective one, and a "party who has signed a contract is charged with knowledge of and assent to its terms." *Arbogast*, 2021 IL App (1st) 210526, at ¶ 21. Love's briefing ignores this language, and this is enough to defeat the company's request for summary judgment.

But the court is similarly disinclined to grant NET's request for summary judgment, as serious questions remain as to whether the contract was accepted at all. Under the common law "mirror image rule," an acceptance "requiring any modification or change in terms constitutes a rejection of the original offer and becomes a counteroffer that must be accepted by the original offeror before a valid contract is formed." *Finnin v. Bob Lindsay, Inc.*, 366 Ill. App. 3d 546, 548–

---

[7] "The mere title of a document is not dispositive of its legal impact as a binding document." *First Union Rail Corp. v. Heller Performance Polymers, Inc.*, No. 03-C-7063, 2007 WL 4224341, at *6 (N.D. Ill. Nov. 27, 2007).

10

49, 852 N.E.2d 446, 448–49, 304 Ill. Dec. 196, 198–99 (3d Dist. 2006).  This principle is relevant here; while Love's acknowledges that Patterson signed the contract, it argues that the signed Proposal was only sent to NET as an *exhibit to a counteroffer* with materially different terms.  The court doubts that an offer returned to the offeror in such a manner, even if ostensibly signed by the offeree, can constitute acceptance.  *See, e.g.*, *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993) (noting that modifications to an offer's terms, even if minor, "preclude[] formation of a contract").

The case *Skyrise Construction Group, LLC v. Annex Construction, LLC*, 956 F.3d 950 (7th Cir. 2020), decided under Wisconsin law, is instructive here.  In *Skyrise*, the defendant (Annex) requested bids for a construction project, and the plaintiff (Skyrise) submitted a proposal; Annex then responded with a letter of intent, and sent a proposed contract.  *Id.* at 953–54.  While that contract was under review by Skyrise, Skyrise asked Annex to "sign our proposal . . . while [we are] reviewing your contract documents."  *Id.* at 954.  Annex signed the proposal and wrote "Contract exhibit A" on the face of the document.  *Id.*  When negotiations on the proposed contract broke down, Skyrise sued, asserting that the signed proposal constituted a binding contract.  *Id.* at 955.  The district court granted summary judgment to Annex, and the Seventh Circuit affirmed. The Court of Appeals noted that Annex's signature on the proposal did not make it a done deal, given that the "Contract exhibit A" marking provided an "unmistakable indication that the bid was simply an exhibit to the larger agreement under review."  *Id.* at 957.  To be sure, *Skyrise* is not on all fours with the current case—the proposal in *Skyrise* was sent while another contract was under review, whereas the Proposal in this case was the first draft contract exchanged by the parties. But broadly speaking, *Skyrise* does support Love's contention that a party's signing of a proposal and designating it as an "exhibit" to another proposed agreement does not constitute acceptance under the common law of contracts.

There is other evidence, as well, that suggests that Love's never accepted the deal.  For example, Love's claims that NET engaged in active negotiations with Love's as to the terms of

11

the Standard Agreement for several weeks, yet never once asserted that a prior binding agreement already existed.  If NET truly believed the Proposal was enforceable, one would expect NET to hold Love's to its terms, or at a minimum assert that a deal had already been struck, and that it viewed the Standard Agreement as a potential modification to a pre-existing deal.  NET never did so.  Instead, it is undisputed that NET only characterized the Proposal as binding years later, perhaps at or near the time that this lawsuit was filed.  (*See* Pl.'s Resp. [60] ¶ 54.)  A reasonable inference is that Tebo unearthed the signed proposal long after the fact, noticed it had been signed, signed it himself, and now attempts to assert it as a contract despite never viewing it as one at the time.  A signed preliminary proposal attached as an exhibit to a different contract, negotiations that went sideways, and a late assertion that the exhibit is itself a binding contract— *Skyrise* is certainly relevant here, even if not perfectly on point.

But while one inference supports Love's point of view, it is not the only inference that a reasonable jury could draw from these facts.  Recall that NET has presented evidence that Ms. Hogue verbally informed Mr. Tebo, in a phone call, that the Proposal had been signed and accepted.  (Pl.'s Resp. [60] ¶ 36.)  Under Illinois law, an oral notification of acceptance renders a contract binding, even if the offer itself was made in writing.  *See* 12 ILL. L. & PRAC. CONTRACTS § 26.  So, if the evidence shows that this phone call took place as described, a reasonable jury could find that Hogue's oral notification constituted acceptance at that point in time, rendering the mechanism by which the signed document was later delivered to Tebo irrelevant.  *See Polinski v. Olszewski,* 2025 IL App (1st) 230936-U, ¶ 96 (1st Dist. 2025) ("[T]his court has long held that where one party signs a contract and informs the other party that he has done so, a binding written contract may be formed 'regardless of whether or not the contract is actually delivered.'" (quoting *M.J. Oldenstedt Plumbing Co. v. Kmart Corp.*, 257 Ill. App. 3d 759, 765, 195 Ill.Dec. 906, 911, 629 N.E.2d 214, 219 (3d Dist. 1994)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 64 (stating that acceptance by telephone is valid).  In other words, if Hogue informed Tebo that the contract had been signed *before* the signed Proposal was emailed to him, the rationale in *Skyrise*

12

would not apply because a jury could find that the contract was accepted and binding prior to its appearance as an exhibit to a counteroffer.

Of course, this explanation is not airtight. To the contrary, Tebo's own conduct suggests that he did not view the phone call as creating a binding contract. In a last-minute affidavit attached to his summary judgment briefing, Tebo asserts that he "executed" the Proposal by signing it himself after receiving a copy of it from Hogue. That Tebo felt the need to take extra steps to execute the Proposal after receiving it is unexplained, and undermines his current argument that the deal was consummated when he received the phone call from Hogue. Perhaps Tebo was confused about the nature of contract law; perhaps he was unwilling to press the issue in a way that might antagonize a potential business partner. Regardless, this confusion underscores that summary judgment is inappropriate in this case, given that answering these questions requires a weighing of witnesses' motivations and credibility. *See Johnson*, 164 F.4th at 1079 (observing that the court does not "weigh evidence or make credibility determinations" at summary judgment).

Thus, the court holds that this factual dispute precludes summary judgment for either party. Only in the case where "no factual dispute exists does the issue of a contract's existence become a question of law for the court." *Kass v. PayPal, Inc.*, 75 F.4th 693, 701 (7th Cir. 2023) (quoting *Arbogast*, 194 N.E.3d at 542–43). That is not the case here, given that the parties have presented contradictory evidence as to whether, by whom, and by what mechanism Tebo was informed that the Proposal had been signed. *See Freeland v. Lorenzini & Assocs., Ltd.*, No. 19 C 07888, 2024 WL 3251584, at *8 (N.D. Ill. July 1, 2024) (denying summary judgment where there was a factual dispute as to the contract's existence).

### B. Missing Terms

Love's also requests summary judgment because the "only conclusion that a reasonable juror could reach is that the Proposal lacks the 'essential terms' to establish a contractual relationship," given that the Proposal includes only "the price and a list of necessary materials."

13

(Def.'s Mot. [42] at 24.)  True, "if material terms are left unresolved . . . there is no enforceable contract."  *In re Broiler Chicken Antitrust Litig.*, 167 F.4th 430, 439–40 (7th Cir. 2026).  But Love's misstates what is actually in the document.  The Specifications Section includes a detailed list of what NET agreed to install, including:

- "Installation of 14,000GPD MBR wastewater treatment plant."
- "[T]wo 38,000 gallon treatment tanks with three 160 square meter quad pod carriers and one sludge return pump each.  Each carrier has duplex pumps."
- "One 38,000 gallon tank with 28,000 gallon settling compartment and 10,000 gallon sludge compartment."
- "[S]ix 10,000 GPD effluent filters in settling compartment."
- "3000 gallon tank with hydrant and pressure pump"
- "[T]wo alternating duplex lift stations"
- "Inspection by the Ogle County Health Department.  Backfill.  Graded.  Start up."

(Proposal [5-1].)  While this list of specifications might be a "list of necessary materials" in an ontological sense, a reasonable jury could find that the list is of requisite specificity to establish a binding contract.

Moreover, the court notes that many of the authorities Love's relies upon for this assertion concern *oral* contracts, where specificity is obviously of more concern.  *See Yash Venture Holdings, LLC v. Moca Fin, Inc.*, 116 F.4th 651, 657–58 (7th Cir. 2024) (examining oral contract); *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machines Corp.*, 547 F.3d 882, 888–90 (7th Cir. 2008) (same).  While Love's also cites *Kalsi Builders, Inc. v. National City Mortgage*, No. 2-10-0499, 2011 WL 10453219, at *6–7 (2nd Dist. June 27, 2011) and *A.S. and W. Club v. Drobnick*, 26 Ill. 2d 521, 524, 187 N.E.2d 247, 249 (Ill. 1962), two cases that concern written contracts, those contracts did not set a price for the work to be performed—the Proposal at issue in this case obviously does not have that same defect.  Each of these cases is distinguishable.

### C.    Plaintiff's Non-Performance

Finally, Love's contends that "NET cannot succeed on its breach of contract claim" because "undisputed evidence shows that NET never installed the WWTP."  (Def.'s Mot. [42] at

25.)  This argument requires only brief discussion.  It is obviously true that NET never built the WWTP, but this was because Love's unequivocally repudiated the Proposal prior to construction beginning.  If one party announces that it does not intend to pay for services contracted for, the other party does not need to provide those services in order to bring a breach of contract claim. Love's cites to *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 50, 470 Ill.Dec. 367, 379, 226 N.E.3d 1163, 1175 (Ill. 2023), but that case does not support its position— to the contrary, it confirms that a "party's duty to perform" is excused if the "other party materially breaches the agreement first later."  *Id.*  To the extent that Love's believes that NET can only sue if it had completed the WWTP, at great financial risk, despite Love's hiring of another contractor, that belief has no support in law.

Love's also claims that "Mr. Tebo's own testimony confirms that NET never intended to perform under the terms set forth in the Proposal." (Def.'s Mot. [42] at 25; Reply [69] at 13 (citing DSOF [42] ¶ 42).)  But this misrepresents the record.  What Tebo *actually* said during the referenced portions of his deposition was that he would not have been willing to accede to the terms of Love's *Standard Agreement* for only $1.3 million, which is why he demanded $1.54 million in exchange for those additional terms.  (Tebo Dep. [60-2] at 180:20–181:9.)  Tebo never stated he was unwilling to perform on the terms outlined in his own Proposal, and the portions of Tebo's testimony cited by Love's explicitly contradicts Love's claim that Tebo never intended to perform.  (*E.g.*, DSOF [42] ¶ 42 (citing Tebo Dep. [60-2] at 180:23–181:9).)

* * * * *

The parties' cross-motions for summary judgment on the breach of express contract claims (Count I and II) are denied.

## II.    Breach of Implied Contract

NET also brings a breach of implied contract claim, asserting that its prior negotiations with Love's constituted a contract implied-in-fact.

15

Under Illinois law, contracts "can be express or implied in fact." *Gociman*, 41 F.4th at 883. "A contract implied in fact is one in which a contractual duty is imposed by a promissory expression which may be inferred from the facts and circumstances and the expressions on the part of the promisor which show an intention to be bound." *Marcatante v. City of Chicago*, 657 F.3d 433, 440 (7th Cir. 2011) (citation and internal quotation marks omitted). Like express contracts, implied contracts require an offer, acceptance, consideration, and mutual assent, *Nat'l Product*, 665 F.3d at 901, but those terms can be "inferred from the conduct of the parties." *Gociman*, 41 F.4th at 883. "In other words, contracts based on promises implied in fact arise on circumstances being proved which, according to the ordinary course of dealing and the common understanding of persons, are in law regarded as sufficient for a mutual intent to contract." *Cent. DuPage Hosp. Ass'n v. Blue Cross & Blue Shield of Mass., Inc.*, No. 22-CV-01194, 2023 WL 7003431, at *2 (N.D. Ill. Oct. 24, 2023) (quoting 12 ILL. L. & PRAC. CONTRACTS § 10).

Love's contends it is entitled to summary judgment on this claim, as well, arguing, *inter alia*, that the terms of the implied contract were not definite enough to constitute a binding deal. On this point, the court agrees. As stated, in order for a contract to be binding, the parties must "look to whether the parties have objectively manifested an intent to be bound by all material terms in the contract." *Broiler Chicken*, 167 F.4th at 439. A material term is one that "materially change[s] the substance of the agreement or affect[s] a party's intent to be bound by the agreement." *Id.* at 439–40. In other words, the agreement must be "sufficiently definite so that its terms are reasonably certain and able to be determined." *Halloran v. Dickerson*, 287 Ill. App. 3d 857, 867–68, 223 Ill. Dec. 323, 331, 679 N.E.2d 774, 782 (5th Dist.1997).

While the *express* Proposal contained detailed specifications and a price for the work, the purported *implied* contract advanced by NET lacked those terms. In fact, as far as the court can tell, the parties agreed on essentially nothing—not even price—prior to the exchanging of written contract offers. NET's briefing states only that "NET agreed to design and install the WWTP . . . in exchange for payment," but is silent as to the specifications of that WWTP and what Love's had

16

agreed to pay. (Pl.'s Opp'n [61-1] at 15–16.) Absent any agreement on price, or specifications from which the court can construct a reasonable price, the court cannot "determine what exactly the parties have agreed to." *Seiden L. Grp., P.C. v. Segal*, 2021 IL App (1st) 200877 ¶ 17, 460 Ill.Dec. 801, 809, 202 N.E.3d 343, 351 (1st Dist. 2021) (requiring that price terms be "sufficiently definite or capable of being ascertained from the parties' contract" in order for a contract to be enforceable). Because these "material terms are left unresolved," there is "no enforceable contract." *Broiler Chicken*, 167 F.4th at 439.

The court grants summary judgment in favor of Love's on the implied contract claim.

### III.    Other Claims

#### A.    Promissory Estoppel

NET also brings a claim for promissory estoppel. Love's challenges on a single ground: it argues that "a plaintiff must show the existence of an unambiguous promise" to succeed on a promissory estoppel claim, and "[n]o such promise exists here." (Def.'s Mot. [42] at 27–28.) Because there is sufficient evidence to support a jury finding that an unambiguous promise was made, as explained above, Love's motion for summary judgment on this point is denied.

The court notes, however, that promissory estoppel does not cleanly fit these facts. As the Illinois Supreme Court has explained, the doctrine "operates to impute contractual stature based upon a promise that is not supported by consideration." *Matthews v. Chicago Transit Auth.*, 2016 IL 117638, ¶ 93, 51 N.E.3d 753, 779–80, 402 Ill. Dec. 1, 27–28 (Ill. 2016). Accordingly, promissory estoppel is a claim that "will succeed where the other elements of a contract exist (offer, acceptance, and mutual assent), but consideration is lacking." *Reitman v. Evanston/Skokie Cmty. Consol. Sch. Dist. 65*, 764 F. Supp. 3d 717, 730 (N.D. Ill. 2025). But consideration does not appear to be an issue here. Love's argues that the Proposal was non-binding because there was no clear *acceptance* of its terms—the company does not challenge it for lack of *consideration*—so the relevance of promissory estoppel is not clear. Regardless, because a lack of consideration affirmative defense is pleaded in Defendant's Answer (see Am. Answer [59] at

10; Answer [11] at 8), it theoretically could come up at trial, so the court will allow it to proceed. Summary judgment is denied on Count IV.

### B. Unjust Enrichment

Finally, Love's moves for summary judgment on Plaintiff's unjust enrichment claim. In Illinois, there is no independent cause of action for unjust enrichment.[8] Instead, unjust enrichment is "a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, or, alternatively, it may be based on contracts which are implied in law." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 742 (7th Cir. 2017) (quoting *Saletech, LLC v. East Balt, Inc.*, 2014 IL App (1st) 132639 ¶36, 386 Ill.Dec. 420, 432, 20 N.E.3d 796, 808 (1st Dist. 2014)).

Love's points out that NET has offered no evidence of "fraud, duress or undue influence," and NET does not object to Love's characterization. (See Pl.'s Opp'n [61-1] at 17–18.) Instead, NET presents its unjust enrichment claim as one that is based on a contract implied in law, as an alternative to its breach-of-express-contract theory. (*Id.*) *See also People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 497, 180 Ill. Dec. 271, 283, 607 N.E.2d 165, 177 (Ill. 1992) ("Because unjust enrichment is based on an implied contract, 'where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'" (citation omitted)). Love's argues this claim must be dismissed because "the unjust enrichment claim cannot survive the dismissal of the related cause of action." (Def.'s Mot. [42] at

---

[8]     Plaintiff has not asserted a claim for *quantum meruit* recovery. While many courts applying Illinois law treat quantum meruit and unjust enrichment as synonymous, they are analytically distinct. "In a quantum meruit action, the measure of recovery is the reasonable value of work and material provided, whereas in an unjust enrichment action, the inquiry focuses on the benefit received and retained as a result of the improvement provided." *Seiden L. Grp.,* , 2021 IL App (1st) 200877 ¶ 31 (citation and internal quotation marks omitted); *see also Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 476–80 (7th Cir. 2009) (Wisconsin law) (reversing district court for conflating unjust enrichment and *quantum meruit* claims). This distinction might become relevant at trial if NET's evidence shows that work was completed, but fails to show that Love's was enriched by it.

29–30.)  But there is a distinction between a contract implied in law (also called "quasi contract") and a contract implied in fact.  See *iMotorsports, Inc. v. Vanderhall Motor Works, Inc.*, 2022 IL App (2d) 210785 ¶ 32, 224 N.E.3d 221, 231, 469 Ill. Dec. 349, 359 (2d Dist. 2022) ("Illinois courts recognize two types of implied contracts—those implied in fact and those implied in law.").  While summary judgment is granted on the latter theory, Love's makes no argument related to the former.  Because recovery for unjust enrichment is still possible under a quasi-contract theory, the court cannot grant summary judgment in its favor on this claim at this point in time.

## CONCLUSION

Plaintiff's motion for summary judgment [61] is denied.  Defendant's motion for summary judgment [38, 42] is granted with respect to the implied contract claim, and otherwise denied.


ENTER:


Dated: March 31, 2026

_____
REBECCA R. PALLMEYER
United States District Judge